**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| JOSHUA MARCUM, | : | Case No. 3:24-cv-209 |
| | : | |
| Petitioner, | : | |
| | : | |
| | : | District Judge Michael J. Newman |
| vs. | : | Magistrate Judge Kimberly A. Jolson |
| | : | |
| WARDEN, PICKAWAY | : | |
| CORRECTIONAL INSTITUTION, | : | |
| | : | |
| Respondent. | : | |

---

**REPORT AND RECOMMENDATION**

---

Pro se Petitioner Joshua Marcum, an inmate in state custody at the Pickaway Correctional Institution, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The matter is before the Court on the Petition (Doc. 1), Return of Writ (Doc. 9), Traverse (Doc. 14), state court record (Doc. 8), and trial transcripts (Doc. 7-1). Upon review, the Undersigned **RECOMMENDS DISMISSAL**.

**I.    FACTS AND PROCEDURAL HISTORY**

Petitioner challenges his conviction and sentence from Montgomery County Court of Common Pleas Case No. 2021-CR-01947, finding him guilty of two counts of rape and one count of gross sexual imposition, and sentencing him to an indefinite term of imprisonment for 20 to 25 years. (Doc. 1, PageID 1).

**A.    Factual Background**

The Second District Court of Appeals in Montgomery County, Ohio, summarized the facts underlying Petitioner's convictions as follows:

{¶ 2} On June 23, 2021, a Montgomery County grand jury indicted Marcum on [] nine counts: These nine counts related to events that transpired on the morning of June 12, 2021, involving Marcum and "Jane Doe." (Footnote 1: We use the fictitious name Jane Doe to protect the identity of the complaining witness.)

{¶ 3} A jury trial was held on October 4-8, 2021. Several witnesses testified for the State, and Marcum testified on his own behalf. Lucas Pyles, a firefighter paramedic for Trotwood Fire and Rescue, Station 72, testified that Jane Doe came to the fire station on June 12, 2021. According to Pyles, Doe stated that she had been sexually assaulted and identified Marcum as the perpetrator. Pyles testified that he did not believe Doe was under the influence of drugs when she was at the station. Pyles also described Doe as "emotionally distraught" and "very believable."

{¶ 4} Jane Doe testified next for the State. She has two daughters who were ages 8 and 13. In June 2021, she lived in Fairfield, Ohio, and was not familiar with the Dayton area. During the week leading up to the night and morning in question, Doe was struggling with the anniversary of her father's death and a recent, unexpected break-up with her boyfriend. She met Marcum on the internet through the Facebook dating app on June 11, 2021. They exchanged several messages and then had two video chats. According to Doe, she invited him to come to her house for drinks that evening. At that time, her oldest daughter was sleeping upstairs in Doe's residence. Although her oldest daughter was pretty independent, Doe would not leave her alone in the house overnight.

{¶ 5} Marcum arrived at Doe's residence at around midnight. Doe was tipsy from drinking rum and coke by the time Marcum arrived. Marcum stated that he needed to buy something to drink, so Doe suggested a gas station close to her place and accompanied him there. Both of them smoked some marijuana while they were in the gas station parking lot. Marcum bought a 6-pack of Smirnoff alcohol. He handed an open bottle of the Smirnoff to Doe. According to Doe, everything became foggy for her soon after she began drinking the Smirnoff. She expected them to return to her house from the gas station, but Marcum pulled out of the gas station and headed in the opposite direction.

{¶ 6} The next thing Doe remembers is having her head down in a couch and her butt up in the air while Marcum had his penis inside Doe's rectum. She did not recognize the couch and did not know where they were. Her hands were tied behind her neck with a wire hanger, and Marcum was holding a knife against the back of her neck. Marcum alternated between putting his penis into her vagina and rectum. Marcum also rubbed something on her vagina that caused a burning sensation. He then forced his penis down her throat. During this oral sex, Doe saw the knife Marcum was holding. Doe stated that she did not consent to any of the sex and she was "cloudy" mentally during the entire time.

{¶ 7} Marcum left the building, and Doe proceeded to untie her hands using her mouth. She then heard her phone vibrating and found it in a red toolbox. She called

her brother and left a voicemail. According to Doe, she was not thinking clearly and subsequently regretted not calling 9-1-1 when she had the opportunity.

{¶ 8} Marcum returned to the building, and Doe told him that she had to pee. Marcum took her outside and held a knife to her as she peed. Doe was baffled that it was daylight outside. Marcum then went into the house that was next to the garage in which they had sex. While he was in the house, Doe began taking pictures of the area for proof and to figure out where she was. Marcum came back out of the house holding a butcher knife and placed it against Doe's stomach. He told her to get into a Suburban vehicle, which was different than the Pontiac Vibe that he had picked her up in the night before.

{¶ 9} Doe begged Marcum to take her home but instead he drove her to a cemetery and a gas station. Then he drove her back to the garage where he had raped her. There was a man and a woman inside the house next to the garage. The woman eventually came out of the house and told Doe to shut up or she would release the dogs on her. Subsequently, Marcum said that he would take Doe home. Marcum stopped for gas at a gas station. When they exited the gas station and stopped at a stop sign, Doe jumped out of the car and ran to the car behind them. The man and woman inside the car agreed to take her to a nearby fire station.

{¶ 10} At the fire station, Doe told the firefighters that she had been raped and kidnapped. She agreed to be taken to the hospital for a sexual assault examination. Office[r] Sherri Jackson rode with her in the ambulance to the hospital. Doe's mother and brother came to the hospital.

{¶ 11} On cross-examination, Doe conceded that she could lose her current job if it turned out that she had willingly gone to Marcum's place and used drugs. She also admitted that she had lied to both her brother and the emergency responders when she told them that she had met Marcum in a bar. She could not explain why she did not call 9-1-1 when she had the opportunity other than that she had panicked. When asked why she did not run away from Marcum's place, Doe explained that she had no idea where to run and was extremely sore from what Marcum had done to her.

{¶ 12} Jordan Schneider, a full-time forensic examiner with S.A.N.E. of Butler County, testified next for the State. S.A.N.E. stands for Sexual Assault Nurse Examiner. Schneider examined Doe and noted bruising on her rectum, an abrasion to her cervix, white fluid in her vagina, black debris in her vagina, and bruising on her wrists. During the almost four-hour exam, Doe was anxious, crying, and pacing.

{¶ 13} Sherri Jackson, a police officer for the City of Trotwood, also testified for the State. Officer Jackson was dispatched to the firehouse on June 12, 2021, to assist with a female who was visibly upset, crying, and saying she had been abducted and raped. She gathered information from Doe and transported an examination kit to a refrigerator. On cross-examination, Officer Jackson stated that

Doe had told her she did not call 9-1-1 because she did not have her phone. But on re-direct examination, Officer Jackson stated that she did not ask Doe why she did not call 9-1-1.

{¶ 14} Zachery Miller, a police officer with the City of Trotwood, testified next for the State. Officer Miller testified that he believed Doe was under the influence when she was at the fire station. He assisted in collecting evidence at the crime scene located at 8780 Post Town Road in Trotwood. Doe's hoodie and underwear were found at the scene. The police also found 3 Smirnoff bottles and a glass pipe with a bowl, which are commonly used to smoke methamphetamine.

{¶ 15} Marvin Scott Broyles, who lived at 8780 Post Town Road with his stepdaughter, also testified for the State. According to Broyles, Marcum had two keys to the garage at that property. Broyles saw Doe on June 12, 2021, walking to and from Marcum's vehicle. He did not notice anything out of the ordinary in Doe's demeanor. But he stated that she kept yelling that she wanted to go home. Broyles's adult stepdaughter told Broyles that Doe sounded aggravated and mentioned that she (Doe) was going to miss a recital.

{¶ 16} Broyles's stepdaughter, Tammy Burton, also testified at the trial; she lived with Broyles at 8780 Post Town Road. Burton remembered seeing Doe on her stepfather's property on June 12, 2021. According to Burton, Doe was yelling at Marcum to take her home, was crying, and said she needed to do her daughter's hair for a dance recital. Burton started getting upset and told Doe to shut up. Burton noted that Marcum appeared intoxicated that morning and that Doe mentioned Marcum had a knife. She testified that she did not threaten to put the dogs on Doe.

{¶ 17} Timothy Ziegler testified at trial. He visited Broyles and Burton on the morning of June 12, 2021. He noted that Doe was freaking out and was hysterical, but she was not crying. She said she needed a ride home and that Marcum had a knife. Ziegler reassured her that she was safe there while she was in front of everybody.

{¶ 18} Doe's brother, who is six years older than Doe, testified that she was a great mother to her children. He described the voicemail that Doe left him as bone chilling. While at the hospital, Doe hugged him very tightly. Doe subsequently had a panic attack when she went from the inside of a restaurant out into the bright sunshine.

{¶ 19} Several witnesses also testified for the State regarding the evidence obtained from Doe, Marcum, and the crime scene. Matt Buddo, a detective with the City of Trotwood Police Department, testified regarding a DNA swab collected from Marcum. Michael Molchan, a Sergeant with the Trotwood Police Department, testified about his search of Marcum's black Pontiac and the recovery of two Smirnoff bottle caps. Logan Schepeler, a forensic scientist at the Ohio Bureau of Criminal Investigation ("BCI"), testified about the results of DNA samples taken

4

from the knife, Doe, and Marcum. He opined that there was a DNA match between Marcum and DNA samples taken from Doe's vagina and right buttock. Beth Underwood, a forensic scientist at BCI, testified that the liquid obtained from the Smirnoff bottle at the crime scene contained methamphetamine. She could not opine as to how much methamphetamine was in the liquid. Kialee Bowles, a forensic toxicologist with the Miami Valley Regional Crime Lab, testified that Doe's urine sample from her examination showed, among other things, the presence of amphetamine, methamphetamine, and the chemical commonly found in marijuana.

{¶ 20} Detective Bethany Morrissette of the Trotwood Police Department testified about obtaining a search warrant for the garage at 8780 Post Town Road and what was found in the search. Detective Morrissette saw, but did not collect, the wire hanger as evidence. Based on information that was relayed to Morrissette, she collected a white rope rather than the white wire. She also assisted Doe in trying to locate the gas station near the crime scene that Doe and Marcum had visited, but Doe was not able to confirm what gas station it was. They did locate the cemetery through which Doe stated Marcum had driven her.

{¶ 21} Marcum testified on his own behalf at trial. He was 44 years old and was a mechanic and landscaper who has five children. Marcum had previously committed a number of crimes involving violence.

{¶ 22} According to Marcum, Doe and he made plans to go to his place while they were video chatting. After Marcum picked up Doe and they made a stop at a gas station, Marcum drove onto the highway, and Doe began rubbing his leg and his penis as he was driving. They were drinking Smirnoff and smoking a marijuana blunt that he had rolled. When they arrived at the garage at 8780 Post Town Road, they had consensual sex for an hour. Someone knocked on the garage door around 3:00 a.m. Marcum picked up a knife and took it outside to check on who knocked. He saw Tammy Burton's cousin, who offered him some methamphetamine. Marcum was a recovering addict and took the methamphetamine. Doe wondered if it was cocaine. Marcum explained to her that it was methamphetamine and would intensify sex. They both decided to try it.

{¶ 23} Marcum suggested that they both ingest the methamphetamine off of each other's genitalia. According to Marcum, he reduced some of the methamphetamine to powder form and placed it on his penis for Doe to swallow while performing oral sex. When Doe proceeded to put his penis in her mouth, she said the methamphetamine was nasty and took a drink of the Smirnoff. Marcum then placed some of the methamphetamine on Doe's vagina and licked it off. Marcum testified that the methamphetamine was potent.

{¶ 24} Marcum stated that he used the wire coat hanger to stir the methamphetamine pipe. He noted that the wire hanger was not long enough to tie

5

someone up. Marcum smoked some of the methamphetamine and then blew it into Doe's mouth during a kiss. After he did this, she performed oral sex on him.

{¶ 25} According to Marcum, Doe then started to get paranoid and had to pee. When she went outside to pee, she suddenly panicked and said she had to get home. Marcum had her get into the Suburban because it had air conditioning. But she was very paranoid in the Suburban and kept thinking someone was in the back seat. Doe even opened the door while the vehicle was moving. Marcum drove Doe back to 8780 Post Town Road, because she had forgotten her garage door opener there. Doe kept getting louder about needing to get home to a recital. Marcum felt too impaired to drive her home and he asked Boyles [sic] and Burton to drive her home. Doe was screaming impatiently, but was not crying or fearful. Marcum denied having a knife on him other than when someone knocked on the garage earlier that morning.

{¶ 26} Marcum ultimately decided to try to drive Doe home. He described Doe as very paranoid and asking about a knife. Doe ultimately jumped out of his car when they were stopped at a stop sign. He left her and drove away.

{¶ 27} Marcum reiterated that he did not kidnap or rape Doe or force her to do anything. He explained that their plan from the video chat was to have sex at his garage, and they ultimately had vaginal, anal, and oral sex.

*State v. Marcum*, 2022-Ohio-3576, 198 N.E.3d 599, at ¶¶ 2–27 (internal citations omitted); (Doc. 8 at Ex. 8, PageID 1049–58 (state court record)).

**B.     Conviction and Sentence**

On June 23, 2021, a grand jury charged Petitioner with four counts of rape under Ohio Revised Code ("ORC") § 2907.02(A) (Counts 1–4), two counts of gross sexual imposition under ORC § 2907.05(A) (Counts 5–6), and three counts of kidnapping under ORC § 2905.01(A) (Counts 7–9). (Doc. 8 at Ex. 1, PageID 986–90). Petitioner pled not guilty. (*Id.* at Ex. 2, PageID 991–92). After a jury trial, Petitioner was found guilty of Counts 2 and 4 (rape, substantially impaired victim) and Count 6 (gross sexual imposition, substantially impaired victim). (Doc. 8 at Ex. 3, PageID 994–95). On the other counts, he was acquitted. (*Id.*). Petitioner was sentenced to a total indefinite term of imprisonment of 20 to 25 years, must fulfill 5 years of post-release control

6

on each count, and must register as a Tier I and Tier III sex offender.  (*Id.* at Ex. 4, PageID 997–98).

### C.    Direct Appeal

Petitioner appealed his conviction to the state appellate court, raising the following two assignments of error:

1. Marcum was denied the effective assistance of counsel when his attorney failed to object to improper testimony and the improper emphasis of that testimony by the State in closing argument; and

2. Marcum was denied a fair trial under the Constitutions of the United States and Ohio when a witness for the State testified about the complaining witnesses' veracity.

(Doc. 8 at Ex. 6, PageID 1006, 1012–18; *see id.* Ex. 7, PageID 1019–47 (the State's responsive breif)).  On October 7, 2022, the state appellate court overruled both assignments of error and affirmed the judgment of the state trial court.  (*Id.* at Ex. 8, PageID 1048–67).

Next, Petitioner filed a Motion for Delayed Appeal with the Ohio Supreme Court (*id.* at Ex. 9, PageID 1070-83), which was granted (*id.* at Ex. 11, PageID 1110).  On March 15, 2023, Petitioner, pro se, raised two propositions of law that mirrored the two assignments of error denied by the appellate court.  (*Id.* at Ex. 12, PageID 1112, 1122–26).  On May 9, 2023, the Court declined to accept jurisdiction.  (*Id.* at Ex. 13, PageID 1153).

### D.    Rule 26(B) Application for Reopening

While his Motion for Delayed Appeal was pending with the Ohio Supreme Court, Petitioner filed a timely pro se Rule 26(B) application for reopening with the state appellate court. (Doc. 8 at Ex. 14, PageID 1154–66).  He raised an ineffective-assistance-of-appellate-counsel claim for failure to raise the following claims on direct appeal:

1. Appellant was prejudiced by the trial court's denial of the Rule 29 Motion for Acquittal where the evidence was insufficient to prove each essential element of the offenses beyond a reasonable doubt; and

2. The convictions in this case were against the manifest weight of the evidence.

(*Id.* at PageID 1155–63). The State opposed. (*Id.* at Ex. 15, PageID 1167–72). The state appellate court ultimately denied his assertions as meritless. (*Id.* at Ex. 16, PageID 1173–80).

When Petitioner appealed the state appellate court's decision to the Ohio Supreme Court. (*Id.* at Ex. 18, PageID 1184–1201). His propositions of law included the two assignments of error denied by the state appellate court and a third, claiming that the state appellate court erred. (*Id.*). The Court declined to accept jurisdiction. (*Id.* at Ex. 19, PageID 1211).

### E.     State Post-Conviction

While his discretionary appeal was pending, Petitioner also filed a pro se post-conviction petition with the state trial court. (Doc. 8 at Ex. 20, PageID 1212–44). There, he claimed his "conviction and sentence are void or voidable because he was denied his right to a fair trial. The prosecution willingly or inadvertently withheld exculpatory material evidence contained in Petitioner's I-Phone 11 that would have impeached the State's key witness." (*Id.* at PageID 1218–24; *see also id.* at Ex. 21, PageID 1245–48 (the State's opposition)). The state trial court dismissed the petition as untimely, and, alternatively, overruled the petition on the merits. (*Id.* at Ex. 23, PageID 1259–66).

On July 26, 2023, Petitioner appealed to the state appellate court, raising the following:

1. The trial court abused its discretion and deprived appellant of Due Process and Equal Protection of the laws when denying his <u>Brady</u> violation claim, without an evidentiary hearing, contrary to clearly established Ohio and United States constitutional law;

2. Appellant was prejudiced by the trial court's finding that his postconviction relief petition was untimely; and

3. The trial court committed procedural and statutory error, prejudicial to appellant, when setting submission dates in postconviction relief, and permitting the state to file an untimely answer without requesting leave and showing good cause.

(*Id.* at Ex. 25, PageID 1272, 1290–97). The State responded in opposition (*id.* at Ex. 26, PageID 1314–43), and Petitioner filed a reply brief (*id.* at Ex. 27, PageID 1344–58). On November 9, 2023, the state appellate court found that Petitioner's post-conviction petition was timely filed but overruled Petitioner's other assignments of error as meritless and affirmed the state trial court's judgment. (*Id.* at Ex. 28, PageID 1359–72).

On December 13, 2023, Petitioner appealed that decision to the Ohio Supreme Court, challenging the state trial court's denial of his *Brady* claim as his sole proposition of law. (*Id.* at Ex. 30, PageID 1377, 1389–92). On February 20, 2024, the Court declined to accept jurisdiction. (*Id.* at Ex. 31, PageID 1412).

## F.    Federal Habeas Corpus

Petitioner filed the instant pro se Petition for a writ of habeas corpus, which was received by the Court on July 17, 2024, raising six claims:

**GROUND ONE:** Petitioner was denied the effective assistance of counsel when his attorney failed to object to improper testimony and the improper emphasis of that testimony by the State in closing argument;

**GROUND TWO:** Petitioner was denied a fair trial under the Constitutions of the United States and Ohio when a witness for the State testified about the complaining witnesses' veracity;

**GROUND THREE:** Petitioner was denied effective assistance of appellate counsel when failing to raise that Petitioner was prejudiced by the trial court's denial of the Rule 29 Motion for Acquittal where the evidence was insufficient to prove each element of the offenses beyond a reasonable doubt;

**GROUND FOUR:** Whether the Court of Appeals' failure to employ the proper analysis during its review prejudiced Petitioner;

**GROUND FIVE:** The trial court abused its discretion and deprived Petitioner of due process and equal protection of the laws when denying his *Brady* violation claim, without an evidentiary hearing, contrary to clearly established Ohio and United States constitutional law; and

**GROUND SIX:** The cumulative effect of the numerous constitutional errors in this case deprived Petitioner of a constitutionally protected fair trial.

(Petition, Doc. 1, PageID 5–25).

## II.    STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This authority guides the Court's review of this Petition.

The United States Supreme Court has described the AEDPA as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction[]' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a 'highly deferential standard for evaluating state-court rulings'" and "demands that state-court decisions be given the benefit of the doubt." (citations and footnote omitted)). "This standard in § 2254(d) is difficult to meet, as intended." *Davis v. Jenkins*, 115 F.4th 545, 553 (6th Cir. 2024) (citing *Harrington*, 562 U.S. at 102); *Haight v. Jordan*, 59 F.4th 817, 831 (6th Cir. 2023) (noting that the AEDPA is a "purposefully demanding standard" (citation omitted)).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief for a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained § 2254(d)(1):

Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of the record before the state court.

*Lang v. Bobby*, 889 F.3d 803, 810 (6th Cir. 2018) (internal citations omitted).

Under § 2254(d)(2), a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (O'Connor, J., concurring)). Instead, a state court's factual findings are "only unreasonable where they are rebutted by clear and convincing evidence and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted). And "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). The petitioner bears the burden of satisfying the

AEDPA.  *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted).  Federal habeas review is limited to "the record before the state court."  *Id.* at 182.

## III.  DISCUSSION

Petitioner raises six grounds for relief.  (Petition, Doc. 1, PageID 5–25).  The Undersigned addresses each in turn.

### A.  Grounds One and Two: Improper Vouching Claims

Petitioner argues that his trial counsel performed deficiently by not objecting to "improper veracity testimony" (Ground One), and by letting the prosecution rely on the testimony during closing arguments without challenge (Ground Two).  (*Id.* at PageID 5–10).  Because the claims are related, the Undersigned addresses them together.

The State called Lucas Pyles, a Trotwood firefighter and paramedic, to testify because he was with Doe right after she was dropped off at the fire station.  Recalling Doe's demeanor, Pyles testified that she was "very believable," and he personally viewed this as a "true rape case."  (*Id.* at PageID 6 (quoting Doc. 7-1, PageID 221)).  Pyles also told the jury about his training and thirteen years of experience as a firefighter-paramedic.  (*Id.*).  Then, during closing arguments, the State reminded the jury that Pyles was the first witness to interact with Doe and that he had found her credible.  (*Id.* at PageID 7 (quoting Doc. 7-1, PageID 902)).

Now, Petitioner argues that his trial counsel should have objected to Pyles' statements and to the prosecution's use of the testimony in closing arguments.  (*Id.*).  Both errors, Petitioner says, deprived him of a fair trial.  (*Id.* at PageID 10).  Respondent counters that both claims fail on the merits, especially under the AEDPA's deferential standard of review, and that Ground Two is procedurally defaulted.  (Return, Doc. 9, PageID 1465–70).

Upon review, it is clear that Petitioner raised these claims on direct appeal (Doc. 8 at Ex. 6, PageID 1003–18), and the state appellate court rejected them:

{¶ 38} To determine whether the outcome of the trial clearly would have been different, we must consider the evidence of record in relation to the counts on which Marcum was convicted. Marcum was convicted of two counts of rape in violation of R.C. 2907.02(A)(1), which provides, in part:

No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * *
(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition[.]

{¶ 39} Marcum also was convicted of one count of gross sexual imposition in violation of R.C. 2907.05(A)(2), which provides, in part:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * *
(2) For the purpose of preventing resistance, the offender substantially impairs the judgment or control of the other person or of one of the other persons by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception.

{¶ 40} The Ohio Supreme Court defines "substantial impairment" in terms of its common usage and has held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [the] conduct or to control [the] conduct." *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987).

{¶ 41} In order to convict Marcum of rape under R.C. 2907.02(A)(1), the State had to prove that Marcum had sexual conduct with Doe, that her ability to consent was substantially impaired, and that Marcum knew or had reasonable cause to believe that Doe was substantially impaired. Further, to convict Marcum of gross sexual imposition under R.C. 2907.05(A)(2), the State had to prove that Marcum had sexual contact with Doe and that he substantially impaired the judgment of Doe by administering a drug to her surreptitiously, by force, or through deception.

{¶ 42} Doe's testimony, if found credible by the jury, satisfied all of the elements of the rape and gross sexual imposition counts of which Marcum was convicted. She testified extensively that she was mentally cloudy after drinking a Smirnoff and that Marcum observed her smoking marijuana and drinking. Further, her testimony supported the allegation that he had intentionally and surreptitiously drugged her with methamphetamine and had sex with her against her will. Even more important to our analysis, here, however, is Marcum's testimony. His testimony also supported the guilty verdicts. He testified that Doe ingested alcohol and methamphetamine and smoked marijuana. Marcum characterized the methamphetamine as potent and noted how paranoid Doe became as a result of the drug. Further, he testified to his own state after ingesting the same drugs, worrying about whether he was sober enough to drive Doe home. Also, he was unable to explain how the methamphetamine got into the Smirnoff bottle. In addition, other witnesses for the State explained that scientific tests showed that there had been methamphetamine and marijuana in Doe's urine sample and methamphetamine in the Smirnoff bottle found at the crime scene.

{¶ 43} Moreover, we do not believe that Pyles's single statement about Doe's credibility, even when amplified by the State in its closing argument, rose to the same potentially weighty level as a statement by a police officer or an expert, especially in light of the fact that the jury had the opportunity to view a video from Doe's visit to the fire station on the morning of June 12, 2021. The jurors were able to view Doe's demeanor at the fire station for themselves and did not have to take the word of Pyles as to Doe's demeanor.

{¶ 44} The six not guilty verdicts make it very clear that this was not a case in which the jury blindly followed the complaining witness's testimony. The jury discerned what it believed from Doe's story and what it believed from Marcum's story, which resulted in six not guilty verdicts and three guilty verdicts. The fact that the three guilty verdicts all centered around counts from the indictment that required Doe's being substantially impaired was understandable, given that Marcum himself provided sufficient testimony to establish that Doe was substantially impaired as a result of methamphetamine that Marcum had administered to Doe. Upon the record before us, we cannot conclude that, but for the error of allowing Pyles's testimony about Doe's veracity and the State's later reference to this testimony, the outcome of the trial clearly would have been different.

* * *

{¶ 49} We agree with Marcum that Pyles's testimony regarding the apparent veracity of Doe's claims of rape should have been objected to by Marcum's counsel and excluded from evidence by the trial court. Further, the State should not have been allowed to reference this testimony as part of its closing argument. Therefore, Marcum has demonstrated that his counsel's performance fell below an objective standard of reasonableness.

14

{¶ 50} But as explained above in our resolution of Marcum's second assignment of error, Marcum did not suffer prejudice as a result of this mistake. Based on its six not guilty verdicts, it is clear that the jury did not blindly accept Doe's version of events. Rather, it appears that the jury found Marcum's testimony more believable than Doe's on the six counts in the indictment that did not involve a substantially impaired victim, or at least found reasonable doubt as to whether Marcum committed the crimes set forth in those six counts. Ultimately, the jury did find that Marcum had sexual conduct and/or contact with someone who was substantially impaired to the point of not being able to consent. It also found that, not only was he aware of Doe's substantial impairment (rape counts), he played an active role in her substantial impairment (gross sexual imposition count). As explained above, the overwhelming evidence of record supported these three convictions.

{¶ 51} On this record, we cannot conclude that there exists a reasonable probability that, but for counsel's error, the result of the trial would have been different.

(*Id.* at Ex. 8, PageID 1061–67).

### 1. Ground for Relief One: Ineffective Assistance of Counsel

A petitioner claiming ineffective assistance of counsel must demonstrate both that his counsel's performance was deficient and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance means "that counsel's representation fell below an objective standard of reasonableness." *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (citing *Strickland*, 466 U.S. at 688). A petitioner "must overcome the 'strong[] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013) (quoting *Strickland*, 466 U.S. at 690). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The prejudice prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The

movant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 703. Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that Petitioner has failed to satisfy one prong, it need not consider the other. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). Ineffective assistance claims raised in habeas corpus are owed an extra level of deference under the AEDPA. *Roger v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) ("And when we apply the highly deferential AEDPA standard to the already deferential *Strickland* standard, we give the state-court decision double deference.").

The state appellate court was not unreasonable in denying this claim on direct appeal. Here, the state appellate court found that Petitioner's counsel performed deficiently when he failed to object to the improper vouching in both Pyles' testimony and the State's closing argument, but the court also found that Petitioner failed to prove that he was prejudiced. (Doc. 8 at Ex. 8, PageID 1066). Although Respondent contends that this Court must defer to trial counsel's performance as a strategic choice (Doc. 9, PageID 1469), this Court must defer to the state court's conclusion that Petitioner satisfied the deficient performance prong under *Strickland*. *See Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

Deference is also owed to the state appellate court's finding that Petitioner was not prejudiced by the deficient performance. Critically, as noted by the state appellate court, the jury rejected the charges that did not involve a substantially impaired victim. The State's efforts to leverage Pyles' testimony about Doe's credibility and sobriety fell short because the verdicts

16

clearly indicate the jury did not wholly accept Doe's version of events. And the State emphasizing Pyles' improper vouching during closing arguments was not so persistent with repeated instances of prosecutorial misconduct to warrant habeas relief. *Stermer v. Warren*, 959 F.3d 704, 726, 734 (6th Cir. 2020) (citing *Berger v. United States*, 295 U.S. 78, 89 (1935)).

The state appellate court also noted the harmlessness of the vouching due to the "overwhelming evidence of record," including Petitioner's own testimony, that supports his convictions. (Doc. 8 at Ex. 8, PageID 1063–67). Petitioner testified that Doe "ingested alcohol and methamphetamine and smoked marijuana" and that the methamphetamine was "potent," noting "how paranoid Doe became as a result of the drug." (Doc. 8 at Ex. 8, PageID 1063–64; Doc. 7-1, PageID 715–16, 725–26, 730, 827 (trial transcripts)). Petitioner testified more to the potency, questioning "whether he was sober enough to drive Doe home" after ingesting the same methamphetamine. (Doc. 8 at Ex. 8, PageID 1064; Doc. 7-1, PageID 728, 734)). The jury determined that Petitioner had sexual contact (gross sexual imposition count) and engaged in sexual conduct (rape counts) with someone too intoxicated to consent. The state appellate court concluded Petitioner's testimony alone could establish the required elements. This Court, sitting in federal habeas review, is required to defer to the state court. *Renico*, 559 U.S. at 773.

The state appellate court was not unreasonable in applying *Strickland* and finding that while Petitioner's trial counsel may have performed deficiently, it was not to his prejudice. (Doc. 8 at Ex. 8, PageID 1065–67). Ground One should be **DENIED** on the merits.

### 2. *Ground for Relief Two: Right to a Fair Trial*

Petitioner next contends that he was denied a fair trial because of the improper vouching. (Petition, Doc. 1, PageID 9–10). Respondent asserts that this claim is procedurally defaulted

because Petitioner's trial counsel failed to make contemporaneous objections at trial to the improper vouching. (Return, Doc. 9, PageID 1454–56). The Undersigned agrees.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). A petitioner must comply with a state's procedural rules to warrant federal habeas review. *Jones v. Bradshaw*, 46 F.4th 459, 484 (6th Cir. 2022) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)). To determine if a procedural default bars a petitioner's claim, the Sixth Circuit has set forth a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the *Maupin* test). First, the reviewing court "must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Jones*, 46 F.4th at 484 (quoting *Maupin*, 785 F.2d at 138). "Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Id*. Third, the court must determine whether the forfeiture is an "adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim." *Id*. (internal quotation marks omitted). If the first three parts are met, a petitioner can excuse the default by showing cause and prejudice or that the outcome will result in a fundamental miscarriage of justice. *Franklin v. Bradshaw*, 695 F.3d 439, 449 (6th Cir. 2012) (citation omitted).

Ohio's contemporaneous objection rule requires trial counsel to object to an issue on the record as it occurs. *Hinkle v. Randle*, 271 F.3d 239, 244-45 (6th Cir. 2001) (citations omitted). As to *Maupin's* first prong, Petitioner failed to follow a state procedural rule when his trial counsel failed to make a contemporaneous objection to the improper vouching. As to the second prong,

the state appellate court actually enforced the procedural rule by conducting plain error review of this claim on direct appeal, pointing out that Petitioner failed to object to the improper vouching at trial.  (Doc. 8 at Ex. 8, PageID 1062); *Theriot v. Vashaw*, 982 F.3d 999, 1004 (6th Cir. 2020) (citing *Hinkle*, 271 F.3d at 244) (finding that a state appellate court's review for plain error is enforcement of a procedural rule).  As to the third prong, the contemporaneous objection rule is an adequate and independent state ground to preclude federal habeas relief.  *Hinkle*, 271 F.3d at 244 (citing *Scott v. Mitchell*, 209 F.3d 854, 867-68 (6th Cir. 2000)).  Ground Two is thus defaulted unless Petitioner can show cause and prejudice or a fundamental miscarriage of justice to excuse the default.  *Franklin*, 695 F.3d at 449 (citing *Coleman*, 501 U.S. at 750).

Petitioner cannot excuse the default with cause and prejudice.  A petitioner has the "burden of showing cause and prejudice to overcome a procedural default."  *Hinkle*, 271 F.3d at 245 (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)).  Ineffective assistance of counsel may constitute cause, so long as that claim itself is not procedurally defaulted.  *Gross v. Warden*, 426 F. App'x 349, 360 (6th Cir. 2011) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).  To the extent that Petitioner presents the ineffective assistance of counsel as cause to excuse the default, Petitioner has shown that his trial counsel performed deficiently by failing to object to the improper testimony.  As detailed in Ground One, Petitioner's counsel should have objected to improper vouching.  Petitioner has failed, however, to show he was prejudiced, as explained above.[1]  Petitioner cannot excuse default with a meritless ineffective assistance of counsel claim.

---

[1] The Court finds that the claim fails to meet the *Strickland* prejudice prong even on de novo review.

Petitioner also maintains that he is actually innocent.[2]  The actual innocence gateway is a high bar that "permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  This gateway requires "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Bell v. Howes*, 703 F.3d 848, 855 (6th Cir. 2012) (quoting *Schlup*, 513 U.S. at 321–24).  This new evidence must establish that "more likely than not, in light of the new evidence, that no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538 (citing *Schlup*, 513 U.S. at 327); *Hubbard*, 98 F.4th at 741.

As Respondent points out, Petitioner has not provided new, reliable evidence to support a gateway actual innocence claim.  To support his innocence assertions, Petitioner attempts to submit recordings that reference messages showing that Doe voluntarily went with him, was not unconscious for several hours, and agreed to sexual contact.  (*See* Motion to Expand, Doc. 12; Traverse, Doc. 14, PageID 1536–37).  But as noted in this Court's July 28, 2025, Order denying his motion to expand the record with those recordings, Petitioner failed to demonstrate that the recordings and messages would not be merely cumulative of evidence already in the state court record.  (Doc. 15, PageID 1553–54).

Attempting to undermine the State's case without new, reliable evidence to support his innocence does not surpass the high bar required to show "more likely than not . . . that no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538

---

[2] To the extent that Petitioner raises a freestanding actual innocence claim (*see* Petition, Doc. 1, PageID 25), the Sixth Circuit has "repeatedly indicated that such claims are not cognizable on habeas." *Smith v. Nagy*, 962 F.3d 192, 207 (6th Cir. 2020) (quoting *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007)); *Smith v. Skipper*, No. 18-1743, 2018 WL 8685469, at *4 (6th Cir. Oct. 19, 2018) (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993)) (concluding that standalone actual innocence claims are not cognizable for non-capital habeas petitioners, leaving the question open as to capital petitioners).

(quoting *Schlup*, 513 U.S. at 327).  Petitioner cannot clear the actual innocence gateway to excuse the default and Ground Two should be **DENIED** as procedurally defaulted.[3]

## B. Ground for Relief Three: Ineffective Assistance of Appellate Counsel

In Ground Three, Petitioner contends that his appellate counsel performed deficiently by failing to raise a sufficiency of evidence claim on direct appeal.  (Petition, Doc. 1, PageID 12–13).  His appellate counsel's failure was to his prejudice, Petitioner maintains, asserting that the State did not prove its substantial impairment theory and challenging the determination that he knew or was aware of Doe's substantial impairment.  (*Id.* at PageID 13–14).  Petitioner seeks de novo review of his sufficiency claim because the state appellate court was unreasonable for applying a plain error review rather than the sufficiency of evidence standard from *Jackson v. Virginia*, 443 U.S. 307 (1979).  (Traverse, Doc. 14, PageID 1525, 1528–29).

The state appellate court, Respondent argues, was not unreasonable in denying this claim.  (Return, Doc. 9, PageID 1472–73).  Respondent asserts that Petitioner's appellate counsel was not deficient for failing to raise a futile sufficiency claim because as the state appellate court pointed out on direct appeal, "there was ample evidence to support [his] convictions from either (or both) the testimony of the victim and [Petitioner] himself."  (*Id.* at PageID 1478–79 (citations omitted)).

Petitioner raised this claim in his Rule 26(B) application for reopening.  (Doc. 8 at Ex. 14, PageID 1155–61).  In Ohio, a criminal defendant may file an application to reopen "the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel."  Ohio App. R. 26(B)(1).  Referencing its detailed analysis of the evidence presented at trial and the elements required to convict Petitioner on the two counts of rape and one

---

[3] For the reasons discussed in Ground One, Ground Two would be dismissed on the merits even if it was not procedurally defaulted.  As explained in Ground One, Petitioner was not prejudiced, and the improper vouching did not render his trial fundamentally unfair.

count of gross sexual imposition, the state appellate court denied the application.  (Doc. 8 at Ex. 16, PageID 1175–80 (quoting *id.* at Ex. 8, PageID 1063–67 (direct appeal denial))).  The appellate court identified *Jackson* as the correct governing standard (*id.* at PageID 1175–76), so Petitioner's request for de novo review of this claim is denied.  *See* 28 U.S.C. § 2254(d)(1).[4]

The *Strickland* test applies to ineffective assistance of appellate counsel claims.  *Burger v. Kemp*, 483 U.S. 776, 781-82 (1987); *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  In presenting the appeal, counsel must provide reasonable professional judgment, *see Evitts v. Lucey*, 469 U.S. 387, 396-98 (1985), but need not advance every argument, regardless of the merit.  *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).  "'[W]innowing out weaker arguments on appeal' is 'the hallmark of effective appellate advocacy.'"  *Hand v. Houk*, 871 F.3d 390, 411 (6th Cir. 2017) (quoting *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002)).

A reviewing court "must assess the strength of the claim that counsel failed to raise," and counsel is ineffective "only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal."  *Henness v. Bagley*, 644 F.3d 308, 317 (6th Cir. 2011) (citing *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)).  If such a probability exists, then the court "must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel."  *Id.*  (citing *Wilson*, 515 F.3d at 707).  Factors include whether the omitted issues were "significant and obvious" and "clearly stronger than those presented."  *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999) (collecting cases).  Counsel's performance is "strongly presumed" to be effective.  *Strickland*, 466 U.S. at 690.

To prove that his appellate counsel was ineffective, Petitioner must show that he would have had a successful sufficiency of evidence claim on direct appeal.  In *Jackson*, the Supreme

---

[4] This federal habeas court must defer to the state appellate court's plain error review.  *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017).

Court established the standard for sufficiency of evidence claims.  Because the state must prove beyond a reasonable doubt every fact necessary for the charged offense, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citation omitted).

The state need not rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id*. at 326.  A habeas reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id*.  The trier of fact must "resolve conflicts in the testimony, [] weigh the evidence, and [] draw reasonable inferences" from the evidence.  *Jackson*, 443 U.S. at 319.  Consequently, the reviewing court is not permitted to reweigh the evidence, re-evaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury.  *See id.* at 318–19, n.13; *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  "[C]ircumstantial evidence is entitled to equal weight as direct evidence."  *Cooper v. Chapman*, 970 F.3d 720, 732 (6th Cir. 2020) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)).  "[T]estimony of the victim alone is constitutionally sufficient to sustain a conviction." *Tucker v. Palmer*, 541 F.3d 652, 658–59 (6th Cir. 2008) (collecting cases).

Petitioner appears to be alleging that his appellate counsel should have challenged Doe's credibility and boosted his own on the issue of Doe's substantial impairment.  But *Jackson* prohibits this type of re-assessment of credibility.  443 U.S. at 318–19, n.13; *Wesson v. Shoop*, 17 F.4th 700, 705 (6th Cir. 2021) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)) (noting

that a federal habeas court must "not second-guess credibility determinations by state courts where we have not also had an opportunity to observe the testimony").

Petitioner also faults his appellate counsel for failing to assert that the prosecution failed to present sufficient evidence that he knew about Doe's impairment and omitted information about the potential effects of Doe's nightly medications.  (Petition, Doc. 1, PageID 12–14; Traverse, Doc. 14, PageID 1525).  But the evidence is viewed in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319.  The parties offered theories on how Doe ingested the methamphetamine, with the State suggesting that Petitioner slipped the methamphetamine into the Smirnoff bottles he offered to Doe.  (Doc. 7-1, PageID 264–65, 325–26).  Petitioner countered that they agreed to use the methamphetamine to "intensif[y] sex," and that he put the drug on each of their genitalia to ingest it.  (*Id.* at PageID 715–16, 821).  The jury assessed the credibility of the opposing theories, and the state appellate court could not have challenged the jury's findings when conducting a sufficiency review under *Jackson*.  Thus, Petitioner cannot show that he would have been successful if he raised a sufficiency of evidence claim on direct appeal.

This Court must defer to the state appellate court's finding that Petitioner's appellate counsel was not ineffective for failing to raise a sufficiency of evidence claim on direct appeal.

Ground Three should be **DENIED** on the merits.

## C.     Ground for Relief Four: State Appellate Court Error, Rule 26(B) Analysis

In Ground Four, Petitioner asserts that the state appellate court failed to employ the proper analysis in reviewing his underlying sufficiency of evidence claim in his Rule 26(B) application for reopening.  (Petition, Doc. 1, PageID 15–16).  Petitioner also contends that the state appellate court unreasonably analyzed the underlying claim under a "voluntary intoxication" standard rather than conducting a sufficiency of evidence analysis.  (*Id.* at PageID 16; *see also* Traverse, Doc. 14,

PageID 1529–30).  As noted above, Petitioner raised this claim to the Ohio Supreme Court, in his appeal of the the state appellate court's denial of his Rule 26(B) application, and the Ohio supreme Court declined to accept jurisdiction.  (Doc. 8 at Ex. 18, PageID 1192–93; *id.* at Ex. 19, PageID 1211).

To the extent that Petitioner challenges the state court's appellate procedures in Ground Four, such a claim is non-cognizable on federal habeas review.  "Federal courts must defer to a state court's interpretation of its own rules of evidence and procedure in considering a habeas petition."  *Moreland v. Bradshaw*, 635 F. Supp. 2d 680, 724 (S.D. Ohio 2008) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)).

To the extent that Petitioner challenges the merits of the state appellate court's underlying sufficiency of evidence analysis, that issue was resolved in Ground Three.

To the extent that Petitioner attempts to assert a standalone sufficiency of evidence claim, that claim was not raised in the state courts and is not properly before the Court.  Raising an ineffective assistance of appellate counsel claim in state court based on the "failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because 'the two claims are analytically distinct."  *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) (quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005)).

Ground Four should be **DENIED**.

### D.    Ground for Relief Five: *Brady* Violation and Abuse of Discretion

Petitioner next contends that the state trial court abused its discretion in denying his claim under *Brady v. Maryland*, 373 U.S. 83 (1963), without an evidentiary hearing in his post-conviction proceedings.  (Petition, Doc. 1, PageID 17–24).  To support his claim, Petitioner asserts

he made law enforcement aware of text messages containing favorable, exculpatory material that he could have used to impeach the State's trial theory.  (*Id.* at PageID 22–24).

Respondent contends that challenging the denial of an evidentiary hearing in a state post-conviction action is not cognizable on federal habeas review.  (Return, Doc. 9, PageID 1479–86).  Even if this claim presented a constitutional issue, Respondent asserts, this Court would still owe deference to the state appellate court's denial.  (*Id*. at PageID 1479–84 (citing Doc. 8 at Ex. 28, PageID 1366–72)).  Respondent points out that material evidence known or knowable to Petitioner cannot underpin a *Brady* violation and additionally maintains that the text messages were "merely cumulative evidence and could not have affected the fairness of [Petitioner's] trial" because Doe's "own testimony confirms the same evidence [Petitioner] claims was withheld."  (*Id*. at PageID 1481, 1485–86).

In reply, Petitioner appears to assert a *Brady* claim, arguing that the state courts were unreasonable in denying such a claim.  (Traverse, Doc. 14, PageID 1532–41).  Petitioner contends that his case was a "credibility contest and hinged upon the jury's believability and credibility determinations."  (*Id*. at PageID 1534).  Petitioner maintains that the state appellate court "ignored the most significant facts of [his] argument, respective to the prosecution's theory of the case presented to prove 'substantial impairment,'" because the texts would cut against the State's theory by impeaching Doe's testimony that she was unconscious for hours.  (*Id.* at PageID 1538).

Petitioner raised a *Brady* claim in his state post-conviction petition (Doc. 8 at Ex. 20, PageID 1218–24), which the state trial court denied without an evidentiary hearing because it found the petition to be untimely and meritless (*id*. at Ex. 23, PageID 1259–66).  The state trial court said, "Quite frankly, nothing in the text messages constitutes new evidence that is material to the defendant's guilt or innocence in this case," pointing out that the "content and context" of

the messages were presented and testified to during trial.  (*Id.* at PageID 1262).  Petitioner appealed that denial to the state appellate court.  (*Id.* at Ex. 25, PageID 1269–98).  The state appellate court overruled this claim, noting that Petitioner was aware of the messages, the State did not suppress the contents of Petitioner's phone, and that the messages related more to the acquitted charges and were not material to the convictions based on the substantial impairment element.  (*Id.* at Ex. 28, PageID 1366–72).

As an initial matter, to the extent that Petitioner asserts that the state trial court abused its discretion in denying Petitioner an evidentiary hearing in his post-conviction action, such claims are not cognizable in habeas review.  The Sixth Circuit has "consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)) (pointing out that errors in a post-conviction action do not challenge the underlying conviction and sentence (additional citations omitted)). Petitioner's abuse of discretion claim should be denied.

To the extent that Petitioner raises a *Brady* claim, this Court must defer to the state appellate court's denial.  *Brady* claims have three elements: (1) the evidence must be favorable; (2) the evidence must have been willfully or inadvertently suppressed by the state; and (3) the suppression resulted in prejudice, *i.e.*, the evidence must be material.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Hughbanks v. Hudson*, 2 F.4th 527, 536 (6th Cir. 2021) (citations omitted).  The evidence must be "exculpatory" or "impeaching" to be favorable.  *Hughbanks*, 2 F.4th at 536 (quoting *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014); *Strickler*, 527 U.S. at 282).  "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question or if the information was available to him

from another source." *Id.* at 537 (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).  The nondisclosure must be "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (quoting *Strickler*, 527 U.S. at 281).

Brady materiality is a "difficult test to meet." *Id.* (quoting *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002)).  The "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 679 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  The evidence must be considered "collectively, not item by item." *Brooks v. Tennessee*, 626 F.3d 878, 892 (6th Cir. 2010) (quoting *Kyles*, 514 U.S. at 436).  "Evidence that is merely cumulative to evidence presented at trial is not material" under *Brady*.  *Id*. at 893 (citations and internal quotations omitted).  The "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Montgomery*, 654 F.3d at 678-79 (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)).

The state appellate court's decision was not unreasonable because the alleged suppressed evidence was "not unknown" to Petitioner.  (Doc. 8 at Ex. 28, PageID 1368–72).  The court noted that Petitioner's own affidavit revealed that he told officers about the messages on his phone.[5]  (*Id.* at PageID 1369).  The court also found that even though the State had possession of Petitioner's phone, the State did not access its contents and then fail to disclose those contents.  (*Id.* at PageID

---

[5] As discussed in this Court's July 28, 2025, Order (Doc. 15) denying his motion to expand, Petitioner seeks to introduce two recordings to demonstrate that officers were aware of the messages in Petitioner's cell phone.  (Doc. 12, PageID 1497).  This in fact shows that Petitioner was aware that the evidence existed and supports the conclusion that the State did not suppress the messages.  *See Clark v. Abdallah*, 131 F.4th 432, 455 (6th Cir. 2025) ("If the person on trial knows or should have known the crucial information, 'there is really nothing for the government to disclose.'" (citation omitted)).

1370).  Evidence is not *Brady* material if the State did not suppress it or if Petitioner knew such evidence existed.  *Hughbanks*, 2 F.4th at 537 (quoting *Carter*, 218 F.3d at 601).  The state appellate court agreed with the state trial court in finding that "nothing in the text messages constituted new evidence that was material to [Petitioner's] guilt or innocence."  (*Id.* at PageID 1370–71 (quoting *id* at Ex. 23, PageID 1262)).  Although Petitioner contends that the messages impeach Doe's testimony about being in distress or agreeing to go with Petitioner voluntarily, those assertions are more relevant to the kidnapping and other rape charges of which Petitioner was acquitted.  Petitioner has not shown how the messages are exculpatory or impeaching on the issue of whether Doe was so substantially impaired she was unable to consent to sexual activity.

Petitioner also failed to show that the text messages are material because he has not shown the verdict would have been different had the text messages been introduced at trial.  *Montgomery*, 654 F.3d at 678 (quoting *Strickler*, 527 U.S. at 281).  As the state appellate court explained, "[T]he text messages at issue relate more closely to the offenses of which [Petitioner] was acquitted" and determined that "[n]one are exculpatory, particularly as to the substantial-impairment offenses." (Doc. 8 at Ex. 28, PageID 1371–72).  Petitioner has not demonstrated how the absence of the messages at trial undermines confidence in his convictions.  *See Montgomery*, 654 F.3d at 679 (quoting *Kyles*, 514 U.S. at 434).  As explained in Ground Three, the state appellate court found that the prosecution presented sufficient evidence to convict Petitioner.

Still more, the messages would be merely cumulative because Petitioner testified to the same information at trial to support his defense theory that Doe went with him willingly.  (Doc. 7-1, PageID 803–08).  In Petitioner's post-conviction proceedings, the state appellate court reiterated its findings from the direct appeal decision, noting that Petitioner "himself provided sufficient testimony to establish that Doe was substantially impaired as a result of methamphetamine that

[Petitioner] has administered to Doe."  (Doc. 8 at Ex. 28, PageID 1371 (quoting *State v. Marcum*, 2022-Ohio-3576, at ¶ 44)).  The state appellate court was not unreasonable because it reviewed the evidence collectively to find that Petitioner failed to satisfy *Brady's* materiality test.

Ground Five should be **DENIED** as not cognizable, or in the alternative, as meritless.

### E.    Ground for Relief Six: Cumulative Effect

Finally, Petitioner asks the Court to add up the alleged constitutional errors and find that they cumulatively denied him a fair trial.  (Petition, Doc. 1, PageID 25).

Notwithstanding procedural default issues, this claim is not cognizable on federal habeas review.  *Hill v. Mitchell*, 842 F.3d 910, 948 (6th Cir. 2016) (citing *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011)).  And, as detailed above, Petitioner has failed to show any constitutional errors to accumulate.  *Getsy*, 495 F.3d at 317 (concluding no errors to accumulate without deciding whether cumulative error is an AEDPA claim).  Ground Six should be **DENIED**.

## IV.    RECOMMENDED DISPOSITION

Based on the foregoing, the Undersigned **RECOMMENDS** this action should be **DISMISSED** as Petitioner's claims do not warrant habeas relief due to procedural default, on the merits, or due to cognizability.

**IT IS SO RECOMMENDED**.

Date: November 17, 2025                    /s/ Kimberly A. Jolson        n
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo and operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.